GRANT COUNTY FISCAL COURT and Ralph C. Pettit, Property Valuation Administrator of Grant County, Kentucky and Grant County Board of Education and Grant County Board of Supervisors, Appellants,

v.

Clifford McGEE and Lillian McGee, his wife and R. C. Ford, Trustee, Appellees.

Court of Appeals of Kentucky.

May 18, 1979.

Otto Daniel Wolff, Covington, for Grant County Fiscal Court, Ralph Pettit and Grant County Bd. of Supervisors.

John A. Hartman, William E. Fletcher, Walton, for Grant County Bd. of Ed.

William F. Threlkeld, Williamstown, for Clifford and Lillian McGee.

D. K. Floyd, Kentucky, for R. C. Ford.

Before GANT, HOWARD and HOWERTON, JJ.

GANT, Judge.

This case involves the formula for assessing taxes on mineral estates, the Fiscal Court, Property Valuation Administrator, Board of Education and Board of Supervisors of Grant County, Kentucky, appealing from the judgment of the circuit court of that county reversing the Board of Tax Appeals.

Appellees Clifford McGee and Lillian McGee purchased by mineral deeds $^{15}/_{16}$ of the minerals under 32,345 acres in Grant County on a farm by farm basis for $1.00 per acre and an agreement to drill several wells, including a deep one. These purchases were made in the 1950's. In 1964, after numerous unsuccessful shallow wells, the McGees sold Ford a $^{14}/_{16}$ interest in the minerals for $0.50 per acre and an agreement to drill the deep well, the McGees retaining $^{1}/_{16}$ of the minerals. The deep well was also unsuccessful in producing oil or gas.

In 1969, Ford sold his $^{14}/_{16}$ interest in the minerals under a 455-acre tract for $10.00 per acre and the McGees sold their $^{1}/_{16}$ interest for $0.68 per acre. In the same year, Ford sold his $^{14}/_{16}$ interest under 109 acres for $10.00 per acre and the McGees sold their $^{1}/_{16}$ interest in the same for $0.62 per acre. Prior to these two sales, Ford had not listed his mineral estate at all for taxes, while the McGees had listed theirs at $200.00. On the basis of these sales, the Property Valuation Administrator assessed the Ford interest at $0.5175 per acre for the years 1965–1968 inclusive and $10.00 per acre for the years 1969 and 1970 on the remaining lands. The McGees were reassessed for 1970 at the $0.68 and $0.62 rate on their remaining lands. The Grant County Board of Supervisors and the Board of Tax Appeals upheld these assessments, but were reversed by the circuit court which fixed the Ford assessment at $0.50 per acre and the McGees at $0.03571 per acre.

■ The parties hereto stipulate, and of course it is the law, that all property must be assessed at its fair cash value based on the price it would bring at a fair voluntary sale. Kentucky Constitution § 172. This has been refined and defined by many court decisions. The most quoted rule appears in the case of *Kenmont Coal Co. v. Perry County Board of Supervisors,* 262 Ky. 764, 91 S.W.2d 47, 48 (1936): "That value [fair cash value], we have decided, is the price which would be agreed upon by a party who desired to, but was not compelled to buy it and an owner who desired to, but was not compelled to sell it." The phrase "fair cash value" has become interchanged with the phrase "fair market value." The dilemma in this case is the determination of the market value of the mineral estates of the appellees under these circumstances.

■ Unquestionably, sales furnish strong evidence upon which to base an assessment. As the court stated in *Evans v. Allen,* 305 Ky. 728, 205 S.W.2d 514, 516 (1947):

The sale price of property is not, under all circumstances, the sole criterion for the guidance of the assessing authority in fixing the value for taxation purposes, but where the property is sold or at near the assessment date and the sale is fair and voluntary the sale price is the best evidence of the property's "fair cash value, estimated at the price it will bring at a fair voluntary sale."

It should be noted that the above language was taken from a case in which the entire property had been sold, not a mere fraction, as in the case at bar. Most, if not all, of the cases utilizing the sale price have been from cases in which the entire property, or at least a large majority of the entire property, has been sold.

The evidence before the Board of Tax Appeals consisted in part of the testimony of the PVA. His evidence was that his assessment was based entirely on the two sales above referred to. He testified that he did not know whether there was a willing buyer or seller, that he had no experience in appraising mineral estates, that to his knowledge there was no production of minerals on any of the land, and that in his assessment of all this property on the surface estate he made no reduction because of the mineral severance.

For the appellees, the testimony of Ford was that of the owners of the 445-acre tract had secured an offer for their farm and entered into a contract for its sale "at what he considered an extra good price." The buyer would not purchase the farm without the mineral rights and Ford finally agreed to sell his rights for $10.00 an acre, which the owners of the surface readily paid. Ford testified that he tried to secure an exchange of other minerals rather than sell the mineral estate but that time would not permit. The second, involving the 109-acre tract, was sold under similar circumstances. A realtor friend of Ford had a contract to sell this property and a prospective purchaser who insisted on the mineral rights. Again Ford was reluctant to sell, but sold for $10.00 an acre in order that the entire estate could be sold.

Following this testimony, there was evidence from two qualified experts that the full value of the mineral rights was $0.50 per acre. We feel that the trial court properly stated our position in this case when, in applying the standard set out in Evans v. Allen, supra, he stated:

If we apply this standard, and it is the only standard applicable in this type of case, to the testimony in this case, we find that while the Property Valuation Administrator knew the price at which two isolated parcels out of the entire block had been sold, he did not inquire and did not know if the purchasers were under a compulsion to buy and made no attempt to ascertain and did not know if the sellers desired to sell. We further

find from the uncontradicted evidence of the property owners that the buyers of the mineral estates had contracted to convey fee simple title to the parcels in questions and thus were under a compulsion to buy and the sellers were in a position where they did not desire to sell but were willing to sell at a grossly overinflated price.

The lower court further cited from the case of *Helman v. Kentucky Board of Tax Appeals,* Ky.App., 554 S.W.2d 889 (1977), in which this Court held that under similar circumstances the testimony of the PVA had no probative value.

The lower court felt that the case of *Department of Revenue v. Anaconda American Brass Co.,* Ky., 435 S.W.2d 65 (1968), was dispositive of this case. This was a case in which the company had purchased a 139-acre tract at an inflated price in order to secure 50 acres upon which to expand its plant. They protested the assessment at sale price because they felt that since the landowner would not merely sell them the 50 acres but insisted upon the sale of the whole tract, and because of their desperate need for the 50 acres, the sale price did not truly reflect the value of the property. The language in that case, although the case is readily distinguishable on its facts, would seem to us to state the law in Kentucky, that being that the sale price of property is not in all circumstances the sole criterion for fixing the fair cash value, and that the circumstances of the sale must be examined to determine the emphasis to be placed upon the sale price.

This Court further feels that there was an element herein which was not touched upon by the lower court and with which we are considerably troubled. It is our opinion that before we can consider fair market value it must be established that there is, in fact, a market. The sales herein constituted 1.7%, or about $\frac{1}{60}$, of the property owned by the appellees. This falls far short of establishing that there is a market for this property. As the court stated in the case of *Board of Supervisors of City of Frankfort v. State National Bank of Frank-*

*fort,* 300 Ky. 620, 189 S.W.2d 942, 946 (1945):

> In the absence of a market for stock or any other property, the estimates of value must, of course, be upon theories deducible from the various elements that enter into its value. Thus we have recognized in several cases the existence of classes of property of a special nature and of real value which are not capable of being marketed and no market for it exists, and which of necessity require the resort to other and unusual methods of ascertaining the taxable value.

We recognize that this property in question has basically two different values. One is its value for potential sale in order to quiet title or pass fee simple title. We do not feel that two isolated sales over a 25-year period of ownership prove that there is a market for this in this category. There was no proof entered in this record that other persons owning property in this 32,-000-acre holding had any desire whatsoever to quiet their title or any need to do so in order to obtain loans or to sell this property. Thus, it would seem that the only market for this property would fall in its second potential, that of its value for mineral purposes. Having failed in the first category to establish a market, the assessing body could rely only upon its value as established by the expert witnesses herein, that of $0.50 per acre for the Ford interest and $0.03571 for the McGee interest.

Accordingly, the judgment is affirmed.

All concur.